## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**Not for Publication**

|  |  |
|---|---|
| ANGELO MARK PAPALIA,<br><br>*Plaintiff,*<br><br>v.<br><br>ARCH INSURANCE COMPANY,<br><br>*Defendant.* | Civil Action No. 2:15-cv-02856<br><br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

The present matter comes before the Court on three motions: (1) Defendant Arch Insurance Company's ("Arch" or "Defendant") motion for partial summary judgment on its declaratory judgment counterclaim and the limits of liability under the policies; (2) Plaintiff Angelo Mark Papalia's ("Plaintiff" or "Papalia") motion for partial summary judgment on the issue of collateral estoppel; and (3) Plaintiff's motion for partial summary judgment on Arch's duty to defend. All three motions are brought pursuant to Federal Rule of Civil Procedure 56.[1] This action concerns

---

[1] Defendant's brief in support of its motion for partial summary judgment will be referred to hereinafter as "Def. Br." (D.E. 43); Plaintiff's opposition to Defendant's motion will be referred to as "Pl. Opp'n" (D.E. 49); and Defendant's reply brief will be referred to as "Def. R.Br." (D.E. 52).

Plaintiff's brief in support of his motion for partial summary judgment on the issue of collateral estoppel will be referred to hereinafter as "Pl. Est. Br." (D.E. 44); Defendant's opposition to Plaintiff's motion will be referred to hereinafter as "Def. Est. Opp'n" (D.E. 47); and Plaintiff's reply brief will be referred to "Pl. Est. R.Br." (D.E. 50).

Plaintiff's brief in support of his motion for partial summary judgment on the issue of Arch's duty to defend will be referred to hereinafter as "Pl. Defend Br." (D.E. 45); Defendant's

Arch's denial of insurance coverage for matters that Plaintiff alleges are "Related Claims," as set forth in the relevant policy provision, and therefore subject to coverage. These motions were decided without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. The Court considered the parties' submissions, and for the reasons stated below, denies Defendant's motion for summary judgment. The Court also denies Plaintiff's motion for summary judgment on the issue of collateral estoppel. The Court grants Plaintiff's motion for summary judgment on the issue of Arch's duty to defend but denies Plaintiff's motion to the extent that he is seeking the reimbursement of specific amounts through his motion. Arch is entitled to further discovery concerning the actual amounts claimed by Papalia.

## I. BACKGROUND

Plaintiff is a former life insurance agent and certified financial planner. Plaintiff's Statement of Material Facts ("PSOMF") (D.E. 45-2) ¶ 1; August 24, 2016 Declaration of Angelo Mark Papalia ("Papalia Decl.") (D.E. 45-3) ¶ 2. Plaintiff also served as a life insurance agent for Columbus Life Insurance Company ("Columbus"). PSOMF ¶ 2; Defendant's Statement of Material Facts ("DSOMF") (D.E. 43-37) ¶ 8. Through Columbus, Plaintiff purchased errors and omissions (professional liability) insurance from Arch. September 2, 2016 Declaration of Eric Jesse ("Jesse Decl.") (D.E. 45-11) ¶ 2. This case stems from two groups of former clients who asserted claims against Plaintiff. The first group of claimants, the "Benefit Plan Claimants," allege that Plaintiff made misrepresentations in connection with the establishment of welfare benefit plans. PSOMF ¶¶ 16-34. The second group, the "Life Settlement Claimants," allege that Plaintiff made misrepresentations in connection with the sale of universal life insurance products. *Id.* ¶¶

---

opposition to Plaintiff's motion will be referred to hereinafter as "Def. Defend Opp'n" (D.E. 46); and Plaintiff's reply brief will be referred to "Pl. Defend R.Br." (D.E. 51).

35-47. For each group of claimants, Arch covered some claims but not others. Plaintiff brought suit seeking coverage in the claims that were denied.

The Arch Policies

Arch sold three relevant policies to Papalia: the 2010 Arch Policy, the 2011 Arch Policy, and the 2012 Arch Policy ("the Arch Policies"). Jesse Decl. Exs. 5, 6, 7. Under the Arch Policies, an agent could select his or her own limits of liability, up to $4,000,000. *Id.* Ex. 5 at ARCH14682, Ex. 6 at ARCH15141, Ex. 7 at ARCH16176. Plaintiff chose to purchase the $4,000,000 limit of liability for himself under each of the Arch Policies and paid the appropriate premium each year. Papalia Decl. ¶ 3; Jesse Decl. Ex. 3 at RFAs Nos. 1-3.

Under the Arch Policies, Arch committed to pay, on behalf of Plaintiff, all "Loss" in connection with certain "Claims" alleging "Wrongful Acts" in the rendering of "Professional Services":

> The Insurer shall pay on behalf of the Insured all Loss which the Insured shall become legally obligated to pay because of a Claim first made against the Insured during the Policy Period . . . for a Wrongful Act committed on or after the Retroactive Date by the Insured solely in the rendering or failing to render Professional Services.

Jesse Decl. Ex. 5 at ARCH14684, Ex. 6 at ARCH15143, Ex. 7 at ARCH16178. "Loss" under the Arch Policies means "Defense Costs, monetary judgments, awards or settlements that an Insured is legally obligated to pay on account of a covered Claim." *Id.* Ex. 5 at ARCH14687, Ex. 6 at ARCH15146, Ex. 7 at ARCH16181. A "Claim" includes, in relevant part, "a written demand for monetary damages received by an Insured or the Sponsoring Company" as well as "a civil proceeding commenced by the service of a complaint or a similar pleading in which monetary damages are sought." *Id.* Ex. 5 at ARCH14685, Ex. 6 at ARCH15144, Ex. 7 at ARCH16179. A "Wrongful Act" is defined as "a negligent act, error or omission or Personal Injury committed by

3

an Insured." *Id*. Ex. 5 at ARCH14689, Ex. 6 at ARCH15148, Ex. 7 at ARCH16183. Lastly, "Professional Services" includes, but is not limited to, "1. the solicitation, sale or servicing of: a. life insurance . . . b. variable insurance products"; "2. the solicitation, sale or administration of employee benefit plans"; and "3. financial planning, advice and consultation solely in connection with any of the products listed in paragraphs 1 and 2 above." *Id*. Ex. 5 at ARCH14687-88, Ex. 6 at ARCH15146-47, Ex. 7 at ARCH16181-82.

Additionally, the Arch Policies provide that Arch "shall have the right and duty to defend any Claim against the Insured seeking sums payable under this Policy, even if the allegations of the Claim are groundless or false." *Id*. Ex. 5 at ARCH14684, Ex. 6 at ARCH15143, Ex. 7 at ARCH 16178. The Arch Policies are "claims made" policies but also include coverage for claims made after the expiration of the policy period if they are "Related Claims."

Specifically, the policies provide as follow:

> All Related Claims shall be deemed a single Claim, subject to a single Each Claim Limit of Liability, if covered, and such Claim shall be considered first made on the date the earliest such Related Claim is first made against an Insured, regardless of whether such date is before or during the Policy Period.

*Id*. Ex. 5 at ARCH14693, Ex. 6 at ARCH15152, Ex. 7 at ARCH16187. "Related Claims" are defined as follows:

> [A]ll Claims, whether made against more than one Insured or by more than one claimant, arising out of a single Wrongful Act or Wrongful Supervision or Termination Act or a series of Wrongful Acts or Wrongful Supervision or Termination Acts that have as common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

*Id.* Ex. 5 at ARCH14688, Ex. 6 at ARCH15147, Ex. 7 at ARCH16182. As noted previously, "Claim" and "Wrongful Act" are defined under the policies. However, "common nexus" is not a defined term, and the parties disagree as to its meaning.

The Benefit Plan Claims

From 2003 until 2010, Plaintiff's services included helping clients establish welfare benefit plans under Section 419 and later Sections 79 and 83 of the Internal Revenue Code ("IRC"). Papalia Decl. ¶ 4. These welfare benefit plans were established through Larry Cronin of Cronin Insurance Services, Inc., an insurance broker (the "Cronin Benefit Plans"). *Id.* The Cronin Benefit Plans were cash value life insurance policies purchased through Plaintiff. *Id.* ¶ 5. The premiums for the plans were determined by an actuary based on the death benefit and age of the participants. *Id.*

In 2007, the IRS changed the rules governing the tax deductibility of contributions plans established under Section 419, which limited the plans' tax advantages, including the ability to deduct certain contributions for the life insurance policies. *Id.* ¶ 6. Following the IRS's rule change, Plaintiff's clients terminated the plans they had established under Section 419. *Id.* Some clients, through Plaintiff, established new Cronin Benefit Plans under Sections 79 or 83. *Id.* In doing so, these clients continued to receive similar tax advantages that they previously had under Section 419. *Id.* In 2010, the IRS began to audit employers and employees that participated in welfare benefit plans established under Section 419. *Id.* Subsequently, the Benefit Plan Claimants were audited by the IRS due to their participation in the Cronin Benefit Plans. PSOMF ¶ 23. The audits resulted in tax liability and penalties for the participants. The claimants, in turn, sued Plaintiff. *Id.*

The Benefit Plan Claimants consist of the Jesta,[2] Tuscano, Polo Development, Wilson, Ruggerio, Pharmacy Group, and the Rolling in the Dough claimants. *Id.* Plaintiff asserts that these claims are related to prior claims of Villagra, Toplin, and Bryan. Pursuant to the relevant policies, Arch defended and indemnified Plaintiff in the Villagra, Toplin, and Bryan actions.[3]

Plaintiff alleges that the Benefit Plan Claimants have numerous similarities with each other and with the Villagra, Toplin, and Bryan matters, including that the claimants (1) relied on Plaintiff as their financial advisor; (2) were convinced by Plaintiff to create a Cronin Benefit Plan under Section 419 of the IRC; (3) obtained life insurance policies that funded the Cronin Benefit Plan; and (4) received representations from Plaintiff that the Cronin Benefit Plans were a legitimate retirement investment, that virtually all of the contributions to the plans would qualify for advantageous tax treatment, and that participants in the plans could withdraw funds on a tax-free basis. *Id.* ¶ 24. Plaintiff further alleges the following common allegations: the IRS never approved a plan similar to the Cronin Benefit Plans; since 1995 the IRS had issued notices that the benefits of plans like the Cronin Benefit Plan would be disallowed and result in penalties, including a notice in 2007 that stated the Section 419 Plans were "listed transactions;" Plaintiff represented to the claimants that they had the option to roll over Section 419 plans into a plan established under Sections 79 or 83 of the IRC and Plaintiff encouraged the claimants to do so; and claimants were audited by the IRS as a result of their participation in the Cronin Benefit Plans and faced liability as a result. *Id.* Defendant agrees that these commonalities exist, but alleges that the claims are

---

[2] The Jesta Action was initially called the "Smeeding" Action when it was asserted by the Jesta Claimants, who were joined by the Tuscano, Polo Development, Wilson, and Ruggerio Claimants. *Id.* All the claimants except for the Jesta Claimants withdrew from the action and re-filed their claims in the Tuscano Action, which was joined by the Pharmacy Group claimants.

[3] In the Bryan case, Arch settled with Plaintiff in lieu of full indemnification.

premised on separate life insurance policies and individualized plans sold to the claimants at different times for varying needs. DSOMF ¶¶ 92-199.

Plaintiff also notes that the same law firm, the Harris Law Firm, represents the Bryan, Jesta, Tuscano, Wilson, Polo Development, Ruggiero, Pharmacy Group and Rolling in the Dough claimants. *See* Papalia Decl. Exs. 7, 12, 13, 14. On behalf of these claimants, the Harris Law Firm sent a demand letter on August 27, 2013, which stated, in part:

> Although each of the Plaintiffs' facts vary slightly, all Plaintiffs will testify that Papalia marketed and sold the [Cronin Benefit] Plans as "safe investments" that were "tax deductible" and were authorized by Congress and the Internal Revenue Service. All Plaintiffs will testify that Papalia provided them with materials that highlighted the purported tax benefits of setting up the Plans. All Plaintiffs will testify that Paplia told them that the Plans provided a guaranteed minimum rate of return on their investment of at least 5%. All Plaintiffs will testify that Papalia told Plaintiffs that they could exit the Plan after so many years and access their initial investment, as well as their return on investment.

Papalia Decl. Ex. 14 at AMP160.

As noted, Arch provided coverage in the Villagra, Toplin and Bryan Actions, subject to a reservation of rights. PSOMF ¶¶ 30, 31; Jesse Decl. Ex. 3 at RFA Nos. 74, 86, 105. Arch adopted a "no coverage" position for the remaining "Benefit Plan Claimants," asserting that they are not covered because the claims were made after the end of the Arch policy periods and were not "Related Claims" vis-a-vis the Villagra, Toplin, or Bryan Actions. PSOMF ¶ 32. Plaintiff alleges that he has already paid a total of $793,718.38 to defend himself in the Jesta, Tuscano and Rolling in the Dough actions. Defendant also argues that sufficient discovery has not yet been taken to determine the reasonableness of the claimed amount of defense costs expended. *Id.* ¶ 33; Defendant's Responsive Statement of Material Facts ("DRSOMF") (D.E. 46) ¶ 33.

The Life Settlement Claims

The Life Settlement Claimants are former clients of Plaintiff who purchased universal life insurance products through him. PSOMF ¶ 35. The life insurance policies were subject to a statutory contestability period, usually two years, during which life insurer could rescind the policy. *Id.* ¶ 36. After the contestability period, the policy could not be rescinded, but the owner could try to sell the policy in the secondary market. *Id.* According to Plaintiff, the claimants allege that due to changes in the market, they were unable to sell their policies on the secondary market or could only do so for an amount substantially less than what they paid for the policy. *Id.* ¶ 37.

The Life Settlement Claimants consist of the Meisinger, Malloy, Bingman, and Kratz Claimants. *Id.* ¶ 38. Plaintiff alleges that these claims relate to an earlier claim by Liebowitz. Plaintiff sets forth the following common allegations between the claimants and Leibowitz: (1) they relied on Plaintiff as their life insurance agent and financial advisor; (2) they purchased a life insurance policy based on Plaintiff's advice; (3) the life insurance policies they purchased were from John Hancock Life Insurance Company and/or Lincoln National Life Insurance Company; (4) Plaintiff misrepresented their ability to resell their policies on the secondary market and made other related misrepresentations; (5) they were subsequently unable to sell their life insurance policies on the secondary market or could do so only at a significant loss; (6) Plaintiff was motivated by large up-front commissions; (7) life insurance was not a suitable investment for the claimants; (8) Plaintiff committed fraud against them; and (9) they are seeking return of the premiums paid for the life insurance policies. *Id.* ¶ 39. Defendant disputes that these allegations are the grounds for the Life Settlement Plan claims. DRSOMF ¶ 39; DSOMF ¶¶ 33-91. Defendant characterizes the Life Settlement Claimants' allegations as divergent; one claimant was allegedly unable to resell her policy because Plaintiff backdated the inception dates of coverage while others

suffered due to a misrepresentation of their life expectancies, among other varying reasons. DRSOMF ¶ 37; DSOMF ¶ 43.

Plaintiff received a demand letter dated February 7, 2011 from the Liebowitz's attorneys and subsequently notified Arch. PSOMF ¶ 42. Arch, in a letter dated April 22, 2011, "accepted coverage" under the 2010 Arch Policy. *Id.* ¶ 43; DSOMF ¶ 32. Subsequently, the Life Settlement Claimants made their demands. PSOMF ¶ 45. On April 3, 2015, Arch denied coverage for these claims, asserting that the claims were made after the end of Arch's policy periods and that they were not "Related Claims" as to the Liebowitz claim. PSOMF ¶ 45. Plaintiff alleges that, as of August 2016, Plaintiff had paid a total of $195,612.53 in defense costs related to the Life Settlement Claims. *Id.* ¶ 46. In addition to contesting coverage, Defendant also argues that sufficient discovery has not yet been taken to determine the reasonableness of the amount of defense costs incurred paid by Plaintiff. DRSOMF ¶ 46.

## II. <u>PROCEDURAL HISTORY</u>

Plaintiff initiated the current action on April 22, 2015. D.E. 1. Defendant answered Plaintiff's Complaint and asserted a counterclaim on June 30, 2015. The counterclaim sought a declaratory judgment finding that the relevant Arch policies did not provide coverage. D.E. 6. Plaintiff answered Arch's counterclaim on July 21, 2015. D.E. 12. Thereafter, pursuant to the Court's pre-trial scheduling orders, the parties engaged in written discovery. After the close of written discovery, each party moved for summary judgment. D.E. 43, 44, 45. Both parties oppose each other's motions. D.E. 46, 47, 49.

## III. <u>STANDARD OF REVIEW</u>

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter, but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

The showing required to establish that there is no genuine issue of material fact depends on whether the moving party bears the burden of proof at trial. On claims for which the moving party does not bear the burden of proof, the movant must demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In contrast, "'[w]hen the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact.'" *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1438 (11th Cir. 1991)). This affirmative showing requires the moving party to show that "'on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party.'" *Id.*

Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to

interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

## IV. <u>CHOICE OF LAW</u>

In an action based on diversity of citizenship, a federal court generally applies the choice-of-law rules of the jurisdiction in which it sits. *Klaxton Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). New Jersey applies the "most significant relationship" test to determine the choice of law. *Amica Mut. Ins. Co. v. Fogel*, 656 F.3d 167, 171-72 (3d Cir. 2011). The first step in the analysis is to determine whether an actual conflict exists between the laws of the two states, which is done "by examining the substance of the potentially applicable laws to determine whether there is a distinction between them." *Carrow v. Fedex Ground Package Sys., Inc.*, No. 16-3026, 2017 WL 1217119, at *4 (D.N.J. Mar. 30, 2017) (quoting *P.V. ex re T.V. v. Camp Jaycee*, 197 N.J. 132, 143 (2008)). If no conflict exists, then the court applies the law of the forum state and ends the conflicts inquiry. *See Rowe v. Hoffman–La Roche, Inc.*, 189 N.J. 615, 621 (2007).

Here, both parties agree that Pennsylvania and New Jersey law are substantially similar on the relevant issues. *See* Def. Br. at 6; Pl. Opp'n at 11. The Court agrees. Therefore, the Court will apply New Jersey law since it is the forum state. The Court notes that the neither the Supreme Court of New Jersey nor that of Pennsylvania has addressed the issue presented here, specifically, the interpretation of the "Related Claims" provisions.

## V. **DISCUSSION**

i.     Insurance Contract Law

Generally, the interpretation of an insurance policy is a question of law for the court. *Frazier Indus. Co. v. Navigators Ins. Co.*, 149 F. Supp. 3d 512, 516 (D.N.J. 2015) (citing *Selective Ins. Co. of Am. v. Hudson E. Pain Mgmt. Osteopathic Med.*, 210 N.J. 597, 605 (2012)). The burden rests with the insured to demonstrate that the claim at issue is within the scope of the policy. *Polarome Int'l, Inc. v. Greenwich Ins. Co.*, 404 N.J. Super. 241, 258 (App. Div. 2008). "An insurance policy is a contract that will be enforced as written when its terms are clear in order that the expectations of the parties will be fulfilled." *Flomerfelt v. Cardiello*, 202 N.J. 432, 441 (2010). When interpreting language in an insurance policy, the words used should be given their plain and ordinary meaning. *Memorial Props., LLC v. Zurich Am. Ins. Co.*, 210 N.J. 512, 525 (2012). , Courts often use dictionary definitions to determine a word's meaning when the policy does not otherwise define it. *Cypress Point Condo. Ass'n, Inc. v. Adria Towers, L.L.C.*, 226 N.J. 403, 426 (2016). If a word or term is ambiguous, then the ambiguity is resolved in favor of the insured. *Memorial Props., LLC*, 210 N.J. at 525; *Cypress Point Condo. Ass'n, Inc.*, 226 N.J. at 416; *see also Butler v. Bonner & Barnewell, Inc.*, 56 N.J. 567, 575 (1970) ("As to insurance contracts specifically, 'the general rule of construction [is] that if the controlling language of a policy will support two meanings, one favorable to the insurer and the other to the insured, the interpretation favoring coverage should be applied.'").

Concerning a duty to defend, "[a]n insurer is contractually obliged to provide the insured with a defense against all actions covered by the insurance policy." *Abouzaid v. Mansard Gardens Assocs., LLC*, 207 N.J. 67, 79 (2011). The duty to defend is broader than the duty to indemnify. *State Nat. Ins. Co. v. Cty. of Camden*, 10 F. Supp. 3d 568, 577 n.8 (D.N.J. 2014). Thus, the duty

to defend is triggered "when the complaint states a claim constituting a risk insured against." *Liberty Ins. Corp. v. Tinplate Purchasing Corp.*, 743 F. Supp. 2d 406, 411 (D.N.J. 2010) (quoting *Danek v. Hommer*, 28 N.J. Super 68, 77 (App. Div. 1953)). In other words, if "the complaint comprehends an injury which *may* be within the policy, a duty to defend will be found." *Abouzaid*, 207 N.J. at 80 (internal quotation marks omitted). Therefore, all "potentially coverable" claims require a defense. *Id.*

The policies at issue are "claims made" rather than "occurrence" insurance policies. Under an "occurrence" policy, "it is the 'occurrence' of the peril that is insured, and so long as that peril occurred during the life of the policy, coverage attaches." *Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 224 N.J. 189, 201 (2016). Claims made policies, on the other hand, are only triggered upon the making of the claim. *Id.* (quoting *Zuckerman v. Nat'l Union Fire Ins. Co.*, 100 N.J. 304, 311 (1985)). Thus, a difference between the two types of policies is that "claims made" insurance policies by definition, cover claims that are actually made by the insured during the policy period. Timely notification by the insured of the claim is part and parcel of the policy itself. *Zuckerman*, 100 N.J. at 324 ("[T]he event that invokes coverage under a 'claims made' policy is transmittal of notice of the claim to the insurance carrier."). By comparison, "occurrence" insurance covers pertinent events that occur while the policy is in effect, even if the insured does not learn of the claim until after the policy has expired. *Id.* at 310.

 ii. Relevant Case Law

While the parties cite numerous cases, they repeatedly refer to a select few throughout their briefing. The Court will therefore address these cases.[4] As noted, neither the highest court of New Jersey nor the highest court of Pennsylvania have definitively ruled on the issue.

---

[4] Like the policies at issue here, the cited cases all involve "claims made" insurance policies.

The first case is *Columbus Life Insurance Co. v. Arch Insurance Co.*, No. 14-01659, 2016 WL 2865952, at *1 (N.D. Ind. May 17, 2016), which arose from the same underlying allegations of Papalia's misconduct regarding the Benefit Plan Claimants, and Arch's denial of coverage for one of those claims. After Arch defended Papalia in the Villagra Action under the Arch 2011 Policy, it subsequently denied coverage for Columbus Life in the Jesta Action. *Id.* at *3. Columbus sued Arch, alleging that Arch improperly denied Columbus' claim for vicarious liability coverage under the policy.[5] *Id.* Columbus argued that, since Arch had previously granted coverage for the Villagra Claim, it was required to provide coverage for the Jesta Claim since the two were "Related Claims" under the policy. *Id.* at *7. The court consideredthe issue pursuant to Ohio law. *Id.* at *28-30.

Looking to the plain language of the "Related Claims" provision, the court ruled that it was "broadly defined" in the policy. *Id.* at *9. In so finding, the *Columbus Life* court first relied on the dictionary definition of "nexus," finding that it was also broad, and included "a connection or link, often a causal one." *Id.* at *7 (citing Black's Law Dictionary (10th ed. 2014)). Thus, the judge rejected Arch's argument that "Related Claims" required the source of the underlying claims or the party pursuing such claims to be identical. *Id.* at *9. Instead, the court in *Columbus Life* observed that the "Related Claims" provision "explicitly includes claims involving more than one claimant and more than one event." *Id.* at *7. Analyzing the two actions at issue there (Villagra and Jesta), the *Columbus Life* court found that "[b]oth actions arose out of Papalia's alleged recommendation[s] . . . [and] misrepresent[ations] . . ." *Id.* at *9. Further, both actions "allege that following Papalia's recommendations resulted in IRS audits, unpaid taxes, penalties, early

---

[5] As noted, Columbus is the "Sponsoring Company" under the Arch Policies. Therefore, Columbus was insured for vicarious liability of the acts of its agents, specifically Papalia.

termination fees, and other damages . . ." *Id.* Given these similarities, the court found a "common nexus" between the underlying claims, and therefore concluded that they met the definition of "Related Claims" under the Arch policy. *Id.*[6]

The parties also cite to *Lehigh Valley Health Network v. Executive Risk Indemnity, Inc.*, No. 99-5916, 2001 WL 21505 (E.D. Pa Jan. 10, 2001). There, plaintiffs brought a declaratory judgment action, asking the court to determine which of the defendant insurance companies was obligated to provide a defense and indemnification for two lawsuits brought against a hospital. *Id.* at *1. The three defendant insurance companies had issued successive policies to the hospital covering July 1993 to July 1999. *Id.* at *4. The underlying claims were filed by two different doctors, Dr. Toonder and Dr. Angelico, against the hospital. Dr. Toonder filed one lawsuit, while Dr. Angelico later sued in federal court followed by a state action. *Id.* at *2-3.. Dr. Toonder alleged that he could not meet the hospital's quotas without filling a vacant position and requested that the hospital consider a candidate (who, it turned out, was Dr. Angelico) for the vacant position. *Id.* at *2. The hospital agreed to consider a surgeon for the post but ultimately did not act on Dr. Angelico's application. *Id.* Dr. Angelico then sued the hospital and other health care providers in federal court, alleging that the defendants conspired to keep him out of the relevant surgical

---

[6] The court in *Columbus Life* also concluded that Arch had a duty to defend Columbus in the Jesta Action. *Id.* at *11. The court rejected Arch's argument that the Jesta Action was not covered because it sought to hold Columbus directly liable rather than vicariously liable as contemplated by the policy. *Id.* The court responded that the breadth of the duty to defend and the language of the policy "anticipated and accepts a duty to defend where a claim includes both covered and uncovered allegations." *Id.* at *10. Therefore, as long as there were some colorable claims of vicarious liability, the duty to defend was triggered although Arch would not have to defend the uncovered portions of the case. *Id.* The *Columbus Life* court further found that once an insurer breaches its duty to defend, it cannot later contest coverage. *Id.* at *12. Thus, it held that since "Arch wrongfully breached its duty to defend Columbus in the Jesta Action; it is estopped from denying coverage under the Policy." *Id.*

market. *Id.* The next year, Dr. Angelico only sued the hospital in state court, asserting many of the same allegations as found in his federal complaint. *Id.* at *3.

The issue facing the court in *Lehigh Valley* was which insurance policy covered Dr. Angelico's lawsuits. The relevant language in the policy was substantially similar to the "Related Claims" provisions here, but it was listed as an exclusion so that the burden of proof fell on the insurance company. *Id.* at *8. In interpreting the exclusion, the *Lehigh Valley* court had to determine whether Dr. Toonder's suit qualified as a related claim to Dr. Angelico's actions. *Id.* at *7.

Applying Pennsylvania law, the *Lehigh Valley* judge concluded that the exclusion, as applied to the facts of the case, was "ambiguous and should be construed against the[] drafter." *Id.* at *8. Analyzing the claims of Dr. Toonder with those of Dr. Angelico, the court found that the claims were "too dissimilar and the nexus between them too attenuated for coverage to be barred as related to a prior claim or litigation." *Id.* at *9. Thus, the claims "differ[ed] to a sufficient degree that they are not reasonably related to preclude coverage." *Id.* While the disputed claims concerned the same vacant position at the hospital, the court in *Lehigh Valley* noted that one suit involved considering a qualified surgeon for the vacant position while the other involved the placement of a particular physician in that position. *Id.* The court continued that the former suit was narrow, alleging an inability to meet the hospital's surgery quota without filling the vacancy, while the second suit broadly claimed that several healthcare providers conspired to keep Dr. Angelico out of the position. *Id.* Since two separate plaintiffs asserted two separate injuries and each reflected distinct interests, the judge held that the claims were not related claims pursuant to the exclusion. *Id.*

The next case, *Connect America Holdings, LLC v. Arch Insurance Co.*, 174 F. Supp. 3d 894 (E.D. Pa. Mar. 31, 2016), involved an "interrelated wrongful acts" exclusion in an Arch policy. The exclusion contained language similar to the provisions at issue here and also stated that "claims for wrongful acts that are related to wrongful acts that occurred before the policy's inception date are *not* covered." *Id.* at 902 (emphasis added). Thus, if the claims were not related, it inured to the plaintiff's, not Arch's, benefit. Arch took the position that the claims were, in fact, related. *Id.*

The central issue in *Connect America* was whether claims asserted in a 2013 lawsuit were "interrelated to claims that had been asserted in a [2009] lawsuit," such that they would be excluded from coverage. *Id.* at 897. Both suits involved the same parties and alleged that plaintiff engaged in wrongful acts involving trademark infringement and unfair competition. *Id.* at 898. The underlying cases were brought by Life Alert, a medical alert response systems company famous for its trademark, "Help, I've Fallen and I Can't Get Up." *Id.* at 897-98. The plaintiff in *Connect America* (defendant in the underlying suits) was a competitor of Life Alert. In the 2009 matter, Life Alert alleged that the plaintiff had engaged in wrongdoing through the use of website "metatags." In 2013, Life Alert asserted that the plaintiff's misconduct was effected through a telemarketing scheme. *Id.* at 897-99. When the plaintiff sought coverage from Arch in the 2013 action, Arch denied coverage, citing the policy's exclusion for interrelated claims, among others. *Id.* at 899.

As noted, the interrelated wrongful acts exclusion was nearly identical to the "Related Claims" provisions in the present action. The policy defined "Interrelated Wrongful Acts" as "Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or

causes." *Id.* at 902. As is the case here, the parties disputed the meaning of "common nexus." *Id.* Arch, contrary to its current position, took the position that the term "common nexus" is interpreted broadly. *Id.* Ultimately, the *Connect America* court found that the meaning of "common nexus" was not clear, and, given the ambiguity, construed the provision against the insurer, Arch. *Id.* Thus, the judge concluded that a "common nexus" required "a link between the acts." *Id.*

Comparing the 2009 and 2013 actions, the court in *Connect America* noted several similarities, namely that the parties were the same and that the cases asserted many of the same causes of action with the same goal. *Id.* at 902-03. Nonetheless, the judge found several distinctions salient to its determination of whether coverage was excluded. First, the *Connect America* court observed that the alleged means varied, with the 2009 case involving a website scheme as opposed to the telemarketing strategy employed in 2013. *Id.* at 903. Moreover, the court continued, the two underlying actions were not temporally related: "The time that transpired after the [2009] scheme ended and the [2013] scheme began, and the different conduct forming the basis of the 2009 action and that complained of in the 2013 amended complaint militate against a finding of a nexus." *Id.* at 903. Accordingly, the *Connect America* court held that the 2013 claims were not adequately "interrelated" with the 2009 action to exclude coverage because they did not "share a sufficient connection or link" with the earlier matter. *Id.* at 904.[7]

Another case cited by both parties is *Cont'l Cas. Co. v. Wendt*, 205 F.3d 1258 (11th Cir. 2000). In *Wendt*, two different lawsuits were filed against an attorney, with each alleging that he gave inaccurate legal advice and made false and misleading statements regarding the legality of

---

[7] As discussed below, the Court concludes that the relevant language is not ambiguous. However, the Court agrees with the ultimate conclusion reached by the judge in *Connect America*. The fact that two different schemes were employed (website metatags as opposed to telemarketing) coupled the break in time between the two schemes militates in favor of finding that the schemes were not related even though each had the same goal.

certain securities investments. *Id.* at 1260. The allegations related to the attorney's sale of promissory notes on behalf of a Canadian corporation. *Id.* at 1259-60.

The lawsuits implicated the attorney's professional liability insurance policy. *Id.* The policy stated, in relevant part, that "the limit of liability stated for 'each claim' is the maximum we will pay for all claims and claim expenses arising out of, or in connection with, the *same or related* wrongful acts." *Id.* (emphasis added). Employing Florida law, The Eleventh Circuit adopted a broad definition of "related" as a "logical or causal connection between two events." *Id.* at 1262. Applying this definition, the court in *Wendt* found the two actions "related" because they were "tied together because all were aimed at a single particular goal" of encouraging investment. *Id.* at 1264. Thus, the Eleventh Circuit concluded, the two actions "comprised a single course of conduct designed to promote investment." *Id.* In so holding, the court found that the policy's language was not ambiguous. *Id.* at 1263. The *Wendt* court further pointed to the factual similarities between the two cases: the attorney appeared at seminars and indicated that he was a securities law expert; the lawyer vouched for, and made representations as to, the legality of the transactions; and the attorney performed various unethical activities aimed at securing investors in the notes. *Id.* The Eleventh Circuit expressly rejected the attorney's argument that the cases were not related because they involved different individuals, the individuals were also different because some were the lawyer's clients, and the individuals were each affected differently by the attorney's actions. *Id.*

iii.    Arch's Position in Other Matters

As discussed, Arch advocated for a broad reading of substantially the same language in *Connect America*. There, the provision at issue was an exclusion, and therefore it inured to Arch's benefit to have the claims be related. 174 F. Supp. 3d at 902. Arch took the position that "nexus"

was broadly defined, and simply required "any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes in common between wrongful acts." *Id.* Arch has also taken this position in at least one other case.

In *Lafayette Life Insurance Co. v. Arch Insurance Co.*, 784 F. Supp. 2d 1034 (N.D. Ind. 2011), an affiliate of Columbus, Lafayette Life Insurance Company, sought coverage under insurance policies with the same "Related Claims" definition as in this case. There, an insurance agent, Gerald Kloppe, was alleged to have deceived dozens of people into spending money to swap or buy life insurance policies through misleading statements and representations. *Id.* at *1035. One issue in the case involved whether a set of claimants' allegations regarding Mr. Kloppe were related to previous claims that involved Mr. Kloppe but were covered by a different life insurance company, AmerUS Life Insurance Company ("the AmerUS Claims"). The AmerUS Claims were made before the Arch Policy was effective and therefore, if the current claims related to the AmerUS Claims, they would not be covered by the Arch policy due to the "Related Claims" provisions. Arch again took the position that "common nexus" should be given an expansive definition, defined as "a connection, tie or link between individuals of a group, members of a series, etc." Jesse Decl. Ex. 8 at 16. Arch went on to conclude that the two sets of claimants had related claims because they "encompasse[d] the common theme of [Mr. Kloppe] misrepresenting the nature of the policy . . . for his benefit and the benefit of his sponsoring company." *Id.*

Defendant attempts to distinguish its prior arguments supporting a broad interpretation of "nexus," by alleging that the facts and circumstances of those cases were different and inapplicable to the present action. Def. Defend Opp'n at 8. Yet, Arch provides no information or analysis

distinguishing the facts or the law. As a result, the Court finds Arch's attempts to distinguish its conflicting positions dubious at best.

    iv.    Arch's Duty to Defend Papalia

    The Court now turns to interpreting the "Related Claims" provisions, determining whether the relevant claims are related, and deciding whether Arch has a duty to defend Papalia. Plaintiff points to the term "all" in the "Related Claims" definition and the broad definition of "nexus" to argue that "Related Claims" should be interpreted broadly to focus on similarities, not differences, between claims. Pl. Defend Br. at 22-25. Defendant responds that "Related Claims" includes "only claims with a direct and substantial nexus of facts, such as those by the same persons who suffered losses by the same harm." Def. Defend Opp'n at 8.

    Looking to the plain meaning of the Arch Policies, the "Related Claims" definition is extraordinarily broad, applying to "*all* Claims . . . that have as common nexus *any* fact, circumstance, situation, event, transaction, cause *or* series of causally connected facts, circumstances, situations, events, transactions or causes." Jesse Decl. Ex. 5 at ARCH14688, Ex. 6 at ARCH15147, Ex. 7 at ARCH16182 (emphases added). First, the provision uses the word "all." No exceptions are listed. *See Estate of Picon v. FBR Grp.*, No. A-2305-12T3, 2013 WL 5610862, at *3 (N.J. Super. Ct. App. Div. Oct. 15, 2013) (finding the terms "any and all" to be "quite broad"). Second, the provision applies to "any" fact, situation, circumstance, transaction, event, cause or a causally related series thereof. The policy uses the word "any" as opposed to a word of limitation such as, for example, "substantial," or "significant." *Id.*

    As to "nexus," since it is not defined in the policy, the Court will rely on its dictionary definition in deciding its ordinary meaning. *See Cypress Point Condo. Ass'n, Inc*, 226 N.J. at 425 (relying on dictionary definition of a term to determine its ordinary meaning in an insurance

contract). As a result, the Court agrees with *Columbus Life* court's interpretation. There, the court looked to the following dictionary definitions of "nexus":

> The Merriam-Webster on-line dictionary defines "nexus" as "a relationship or connection between people or things," and a "connection, link; also: a causal link; a connected group or series; center, focus." Black's Law Dictionary defines "nexus" as "a connection or link, often a causal one."

*Columbus Life Ins. Co.*, 2016 WL 2865952, at *7 (internal citations omitted). The Court adopts the same definition. *Id.* The Court notes that Arch, in prior cases, has advocated for a similarly broad interpretation. Thus, "claims can be related if they arise from a nexus of logically or causally related facts." *Id.* at *8.

Moreover, the Court agrees with the determination made in *Columbus Life* and finds the language of the Arch Policy to be clear and unambiguous. While the *Lehigh Valley* court found a similar related claims provision ambiguous, it did not explain why it reached that conclusion.[8] In fact, the *Lehigh Valley* decision did not have a detailed analysis of the relevant policy language. Even if this Court were to agree with the *Lehigh Valley* court and find the policy ambiguous, the ambiguity would be resolved against Arch as the insurance company. *See Memorial Props., LLC*, 210 N.J. at 525 (finding that ambiguities must be resolved in favor of the insured); *see also Lehigh Valley Health Network*, 2001 WL 21505 at *9 (resolving ambiguity in favor of insured).

The Court must next determine whether the Benefit Plan Claimants and the Life Insurance Claimants are "Related Claims" as to the prior relevant actions covered by Arch. Plaintiff asserts

---

[8] In the cases discussed, the courts have been split as to whether similar language is ambiguous. Besides *Lehigh Valley*, the court in *Connect America* also found the language to be ambiguous. However, like *Lehigh Valley*, *Connect America* ruled that the language was ambiguous without explanation except to note that the parties disagreed as to its meaning. On the other hand, the *Wendt* court did not find any ambiguity. In the Court's view, the judge in *Columbus Life* performed a more substantive analysis of the language and the Court finds the reasoning to be persuasive.

that the Villagra, Toplin, and Bryan Actions "share common allegations and arise from the same set of circumstances as the [] Benefit Plan Claims," making them "Related Claims" under the 2011 and 2012 Arch Policies. Pl. Defend Br. at 22. Similarly, Plaintiff argues that the Life Settlement Claims "share commonalities with and arise from the same circumstances as the Liebowitz Claim," making them "Related Claims" under the 2010 Arch Policy. *Id.* Additionally, Plaintiff asserts that the fact that the many of the claimants had the same attorney is an indicator that they are "Related Claims." *Id.* at 27 (pointing out that the Benefit Plan Claimants are all represented by the Harris Law Firm). Further, the fact that the attorney demand letter stated that the claimants would assert common issues also indicates that the claims are related, according to Plaintiff. *Id.* at 12.

Defendant advances numerous arguments in support of its motion for summary judgment and in opposition to Plaintiff's motions. The Court will address each argument in turn.

Defendant first argues that since the Arch Policies are claims made policies, Plaintiff cannot "demand[] coverage for claims first made and reported after [the] expiration of the Policies." Def. Br. at 8. Arch misstates the central issue here. The issue is not whether the policy is a claims made or occurrence policy. Both parties admit the Arch Policies are claims made policies. Rather, the issue is whether the "Related Claims" provisions bring the contested claims within the purview of the Arch Policies.

Defendant then argues that it is immaterial that many of the claimants in the Benefit Plan Claimants have the same attorney. Def. Defend Opp'n at 12. The Court agrees and does not consider counsel relevant in deciding whether the claims are related. However, Defendant also argues that "[a]llegations about anticipated common testimony contained in a demand letter . . . likewise has no bearing on whether these claims are related." *Id.* Defendant argues that the Court

should "disregard" an attorney demand letter because it is "self-serving" and "designed to intimidate an insurer." *Id*. at 12-14. Plaintiff responds that, among other things, the demand letter is a "claim," which Arch has a duty to defend. Pl. Defend R.Br. at 2 n.1 The Court disagrees with Arch as to the relevance of the demand letter. First, the demand letter is a "Claim" under the Arch policies. Moreover, the demand letter indicates the same allegations to which all claimants will attest, and these similarities support a finding that the claims are related. *See Connect America*, 174 F. Supp. 3d at 904 (finding that while the opinion of counsel in the underlying case is not dispositive, it is probative to the relatedness of the claims). Finally, while it claims the demand letter to be self-serving, Arch fails to point to any inaccuracies or misstatements in the letter.

Arch additionally argues that the "Related Claims" provision applies the date a claim is reported. Def. R.Br. at 2. But this contention is easily refuted by the actual language of the "Related Claims" provision. The language clearly states that any related claims date back to the first related claim. *See Jesse Decl. Ex. 5 at ARCH14693, Ex. 6 at ARCH15152, Ex. 7 at ARCH16187 ("All Related Claims shall be deemed a single Claim . . . and such Claim *shall be considered first made on the date the earliest such Related Claim is first made* against an Insured, regardless of whether such date is before or during the Policy Period." (emphasis added)). *See also Columbus Life Ins. Co.*, 2016 WL 2865952, at *9 (finding that the post-policy claim was considered to have been made on the date its "related" claim was first reported). Thus, the Court finds Defendant's argument unpersuasive.

Arch also argues that the claims are not related because they involve different parties. Def. Defend Opp'n at 9-10. This assertion, again, is easily refuted by the express language of the policy, which defines "Related Claims" as "all Claims, whether made against more than one Insured *or by more than one claimant* . . ." Jesse Decl. Ex. 5 at ARCH14688, Ex. 6 at ARCH15147, Ex. 7 at

ARCH16182 (emphasis added); *see also Columbus Life Ins. Co.*, 2016 WL 2865952, at *9 (holding that the Arch Policy's "Related Claims" provision does not require that "the source of the claims be identical," but rather allows for claims made "by more than one claimant"). The Court therefore finds that separate parties can bring "Related Claims" under the Arch Policies.

Lastly, Arch argues that the Benefit Plan Claims and Life Settlement Claims do not share a connection or "nexus" with their predecessor claims, and therefore they are not related under the Arch Policies. Def. Defend Opp'n at 11-20. However, Arch does not analyze the terms of the "Related Claims" provision in making this argument. Also, Arch trivializes the similarities cited by Plaintiff, comparing them to "both claims being for money damages, both being made by American citizens, both being made on Wednesdays." *Id.* at 11. This comparison is, at best, an inaccurate depiction of the numerous and central commonalities shared by the Benefit Plan Claimants and the Life Settlement Claimants.

The Court finds that the Benefit Plan Claims are, under the policies, related to the claims in the Villagra, Toplin, and Bryan actions. The Court further finds that the Life Insurance Claims are "Related" to the Liebowitz claim. Therefore, Arch has a duty to defend the Benefit Plan and Life Insurance Claims.

Here, Papalia is alleged to have engaged in two distinct schemes: (1) the Benefit Plan scheme; and (2) the Life Insurance scheme.[9] In the Benefit Plan scheme, the claimants allege that Papalia misrepresented that the Cronin Benefit Plans were a legitimate retirement investment, virtually all of the contributions to the plans would qualify for advantageous tax treatment, and participants in the plans could withdraw funds on a tax-free basis. Initially, Papalia advised clients

---

[9] The Court would be sympathetic to Arch's position if Papalia asserted that the Benefit Plan Claims were related, under the policies, to the Life Insurance claims. But Papalia does not make that argument.

to establish plans under Section 419 of the IRS Code. Subsequently, the IRS changed the rules governing the tax deductibility of contribution plans established under Section 419 and the IRS had also provided prior warnings concerning such plans. In response, Papalia advised clients to establish new Cronin Benefit Plans under Sections 79 or 83, which Papalia represented had similar tax benefits as Section 419 Plans. Soon thereafter, the IRS audited the Benefit Plan Claimants resulting in tax liability and penalty to the participants. These commonalities are true of both the Benefit Plan Claimants as well as the Villagra, Toplin and Bryan Actions.

The Court agrees with the following analysis by the court in *Columbus Life* held when comparing the Villagra and Jesta Actions:

> Both actions arose out of Papalia's alleged recommendation that the Villagras and the Jesta Rx Group create the same type of tax-advantaged plan funded by Columbus insurance policies. In both actions, Papalia allegedly misrepresented the tax advantages of the plans, and concealed the truth about the plans. Both actions allege that following Papalia's recommendations resulted in IRS audits, unpaid taxes, penalties, early termination fees and other damages to the plaintiffs.

2016 WL 2865952, at *9. While in this case, the plans were funded by insurance policies that were not issued by Columbus, the Court does not find that difference to be material. The source of the insurance policies had no impact on the success of the scheme. To be sure, the scheme depended on life insurance policies but it did not matter who issued them. The claims here involve the same misrepresentations, the same types of welfare benefit plans, and the same result. Importantly, they all relate to Papalia's overarching scheme – to financially benefit from selling welfare benefit plans by misrepresenting the policies as tax-deductible investments. *See, e.g.*, DSOMF ¶¶ 92-105 (describing how Papalia urged the Villagra Claimants to place their funds in a Section 419 Plan, told them the contributions would be tax deductible, and the claimants suffered as a result), *id.* ¶¶ 146-150 (explaining how Papalia solicited the Tuscano Claimants to establish

Section 419 Plans, misrepresented the conditions of the plan and subsequently the Tuscano Claimants incurred large fees as a result).

In *Wendt*, the Eleventh Circuit found that an attorney's false and misleading statements to various clients regarding the legality of securities investments were "tied together because all were aimed at a single particular goal" of encouraging investment. 205 F.3d at 1264. The *Wendt* Court concluded that the attorney engaged in a "single course of conduct designed to promote investment." *Id*. Similarly, here, Papalia had a single particular goal: to have his clients invest, through life insurance, in the same plan that would not provide the promised tax benefits.

The same analysis applies to the Life Settlement Claims and the Liebowitz Claim. Once again, Papalia had a single overarching goal: to sell unsuitable life insurance policies to the claimants so that Paplia could collect large commissions. All claimants were unable to later sell their policies on the secondary market, or sold them at a loss, despite Papalia's advice to the contrary.

Again, these commonalities demonstrate that each client was part of an overall plan and that Papalia had a common goal. Also, the Life Settlement Claims and the Liebowitz Claim share the same recommendations and misrepresentations made by Papalia, and the same consequences as a result. *See, e.g.*, Def. Br. at 14 (stating that Papalia recommended Liebowitz purchase life insurance that "exceeded Mr. Liebowitz's particular financial needs" and then Liebowitz "was unable able to sell several of the new policies [on the] secondary market"); DSMOF ¶¶ 70-77 (describing how Papalia convinced the Bingman Claimants to purchase a policy that he said could be resold for a profit on the secondary market, and then "resale of the policy for any profit [became] impossible"). Therefore, the Life Settlement Claims share a "common nexus" with the Liebowitz claim and thus are "Related Claims" for the purpose of the Arch Policies, with one exception.

Arch's duty to defend the Meisinger claim does not extend to the allegations concerning back-dating, which is an allegation unique to Meisinger[10]

Since the Benefit Plain Claims are "related" to the Villagra, Toplin and Bryan actions, and the Life Settlement Claims are "related" to the Liebowitz action, Arch has a duty to defend the related claims pursuant to the relevant policies. *See Abouzaid*, 207 N.J. at 80.

Plaintiff further asks this Court to require Arch to reimburse Papalia for the past defense costs he paid in connection with the Benefit Plan and Life Settlement Claims. Pl. Defend Br. at 35. The Court denies Plaintiff's request for the reimbursement of specific amounts at this time because full discovery on the issue has not been taken. Following complete discovery, the parties can seek any relief which they deem appropriate.

v.      Limit of Liability under the Arch Policy

The final issue raised by Defendant is Papalia's limit of liability under the Arch Policy. Specifically, Arch argues that the limit is shared with Columbus as the "Sponsoring Company." Def. Br. at 27-28. The Arch Policies provide that "each Agent" has his or her own limit of liability: "Limit of Liability Each Agent: The Limit of Liability of the Insurer for all Loss for all Claims first made Against each Agent during the Policy Period . . . shall not exceed the amount stated in Item 4 of the Declarations as Aggregate Each Agent." Jesse Decl. Ex. 6 at ARCH15152. Agents

---

[10] The letter written by Ms. Meisinger's attorneys states that "[t]he fundamental reason why the Trust had depleted its assets was because . . . Papalia had back-dated the Policy." *See* Papalia Decl. Ex. 24 at AMP602. Additionally, the letter discusses new calculations that dramatically increased Ms. Meisinger's life expectancy calculation and "[t]he effect of the increase life expectancies was to decimate the 're-sale' value of the Policy on the life settlement market." *Id.* at AMP606. It therefore appears that both the back-dating and the change in Ms. Meisinger's life expectancy calculations contributed to the de-valuing of her policy and subsequent inability to sell it in the secondary market. The Leibowitz claim does not address alleged back-dating nor do the allegations of the other Life Insurance Claimants. As a result, Arch's duty to defend does not encompass Meisinger's allegations of back-dating.

could choose among four different limits of liability, with each option resulting in a different premium. *Id.* at ARCH15140-41. Mr. Papalia selected "Option 4," providing him with a $4,000,000 limit of liability for "Each Claim" and "Aggregate Each Agent for the Policy Period." *Id.* at ARCH15141. There is no dispute that Papalia paid the necessary premiums.

The Sponsoring Company, Columbus, is only covered for vicarious liability under the policy. *Id.* at ARCH15143 § I.C. The limits of liability for the Sponsoring Company are set forth as follows:

> 3. Limit of Liability Sponsoring Company . . .: No Additional Limits of Liability are provided to the Sponsoring Company under Section I.C. . . . [.] The Limit of Liability of the Insurer for Loss for all Claims first made against the Sponsoring Company . . . during the Policy Period . . . shall be the Limit of Liability applicable to the Agent whose Wrongful Act . . . gave rise to the Claim . . . [.] If a Claim made against the Sponsoring Company includes covered and uncovered allegations or Loss or both, the Sponsoring Company and the Insurer agree to use their best efforts to allocate such amounts based on the relative exposure of the parties to covered and uncovered Loss or Defense Costs or both.

*Id.* at ARCH15152. This provision does not expressly limit or reduce the limit of liability for the Agent. Rather, it provides that the limit of liability for the Sponsoring Company cannot be greater than, or "additional" to, the limit selected by the Agent. In other words, Columbus could not select an amount higher than that selected by the Agent. Here, Papalia selected the maximum coverage and paid for it. There is no language indicating that the limit of liability is "shared" between the Agent and Sponsoring Company. Thus, this provision is unambiguous and does not provide for a shared limit of liability between Papalia, as the Agent, and Columbus, as the sponsoring company.

This interpretation is buttressed by other provisions in the policy. For example, the CPA endorsement, provides as follows:

> [t]he Limits of Liability Available to a CPA by virtue of this endorsement *shall be part of, and not in addition to,* that Limit of

> Liability that is applicable to the Agent for whom the CPA is allegedly vicariously liable. *No separate Limit of Liability is afforded to a CPA, and this endorsement in no way serves to increase the Limits of Liability of an Agent(s) as stated in the Declarations.*

*Id.* at ARCH15167 (emphases added). This endorsement makes clear that the limits of liability as to CPAs (1) are "part of, and not in addition to," an agent's limit of liability; and (2) do not increase an agent's liability coverage. The language in the CPA provision stands in stark contrast to that in Sponsoring Company section. The drafter of the policies, Arch, used materially different language in the two sections. Arch argues that the Sponsoring Company provision says that same thing as the CPA provision. Pl. Defend R.Br. at 11-12 ("[B]oth the shared Limit of Liability provision and CPA endorsement express the same concept. . . . Although using different ordinary words, the provision and endorsement say the say same thing."). It doesn't.

If the Court accepted Arch's argument, then the Court would conclude that the important differences between these two provisions would render the limit of liability provisions ambiguous. *See Cypress Point Condo. Ass'n, Inc.*, 226 N.J. at 416 ("The court's responsibility is to give effect to the whole policy, not just one part of it."). Thus, the Court would construe the provision against the insurance company, Arch, and find that Papalia has an individual limit of liability of $4,000,000, not shared with Columbus. *See Memorial Props., LLC*, 210 N.J. at 525 (finding that ambiguities must be resolved in favor of the insured).[11]

Therefore, the Court denies Defendant's motion for summary judgment on limiting Plaintiff's liability.

---

[11] Moreover, when contract language is ambiguous, courts look to the reasonable expectation of the insured. *See Flomerfelt*, 202 N.J. at 441 ("If the terms are not clear, but instead are ambiguous, they are construed against the insurer and in favor of the insured, in order to give effect to the insured's reasonable expectations.").

vi.     Collateral Estoppel[12]

Plaintiff moves separately for partial summary judgment on the issue of collateral estoppel. Pl. Est. Br. at 5. He argues that because the *Columbus Life* Opinion held that the Jesta and Villagra actions are "Related Claims" under the Arch Policy, Arch is collaterally estopped from re-litigating the issue of whether these two actions are "Related Claims" under the Arch Policies. *Id.*

"Issue preclusion, or collateral estoppel, prevents parties from re-litigating an issue that has already been actually litigated." *Fresh Prepared Foods, Inc. v. Farm Ridge Foods LLC*, No. 10-6310, 2013 WL 4804816, at *7 (D.N.J. Sept. 9, 2013). "The prerequisites for the application of issue preclusion are satisfied when: '(1) the issue sought to be precluded [is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment.'" *Burlington N. R.R. Co. v. Hyundai Merch. Marine Co.*, 63 F.3d 1227, 1231–32 (3d Cir. 1995) (quoting *In re Graham*, 973 F.2d 1089, 1097 (3d Cir. 1992)).

Defendant argues that the issues presented in *Columbus Life* and in the current action are not identical. Def. Est. Opp'n at 3. In particular, Arch points out that "all issues presented by *Columbus Life* were decided under Ohio law." *Id.* at 3. Since this case is being decided under New Jersey Law, Arch contends that the issues are not truly "identical." *Id.*

The Court finds this argument dispositive and therefore does not reach the remainder of the parties' arguments on the issue of collateral estoppel. "For issue preclusion to apply, the issue decided in the prior adjudication must have been identical to the one presented in the later action." *Hitchens v. Cty. of Montgomery*, 98 F. App'x 106, 111–12 (3d Cir. 2004). In *Columbus Life*, the

---

[12] A Federal Court applies federal law to determine the preclusive effects of a prior judgment. *Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 145 (3d Cir. 1999).

court applied Ohio law. 2016 WL 2865952, at *4. Here, the Court has applied New Jersey law. Although the Court concluded that New Jersey law would ultimately be applied in the same manner as Ohio law in *Columbus Life*, this conclusion was reached after an independent review of New Jersey law.

Since the issues presented in *Columbus Life* and this action are not identical, specifically different states' law apply, the Court declines to give the prior issue preclusive effect. *See Koshatka v. Phila. Newspapers, Inc.*, 762 F.2d 329, 337 (3d Cir. 1985) (finding a federal Section 301 action distinct from a common law oral contract claim and therefore not giving the former preclusive effect). Nonetheless, as noted, the Court finds the reasoning and conclusion of the *Columbus Life* Court persuasive and equally applicable under New Jersey law. The Court denies Plaintiff's motion as to collateral estoppel.

### 3. **CONCLUSION**

For the reasons set forth above and for good cause shown, the Court **DENIES** Defendant's motion for summary judgment as to limits of liability and Arch's request for a declaratory judgment. The Court **DENIES** Plaintiff's motion for summary judgment with respect to the issue of collateral estoppel and **GRANTS** Plaintiff's motion for summary judgment as to Arch's duty to defend but denies Plaintiff's request (to the extent he is making it) for payment of specific amounts. Arch is entitled to additional discovery on the amounts allegedly paid by Plaintiff. An appropriate Order accompanies this Opinion.

**Date:** August 1, 2017

JOHN MICHAEL VAZQUEZ
UNITED STATES DISTRICT JUDGE